Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAGISTRATE JUDGE BERNARD ZIMMERMAN

Tagged, Inc.,                      )
                                   )
             Plaintiff,            )
                                   )
  vs.                              )  NO. C 09-1706-BZ
                                   )
Does 1-10, et al.,                 )
                                   )  San Francisco, California
             Defendants.          )  Wednesday
                                   )  June 3, 2009
_____)  10:10 a.m.


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

**For Plaintiff**:           Perkins Coie, LLP
                             101 Jefferson Drive
                             Menlo Park, CA  94025-1114
                             (650) 838-4401
                             (650) 838-4601 (fax)
                        **BY:  BRIAN HENNESSY**


**Reported By:   Lydia Zinn, CSR #9223, RPR**
                **Official Reporter - U.S. District Court**

1          **THE COURT:**  So let's call Tagged.

2          **THE CLERK:**  Calling Civil Action C. 09-1706, Tagged,

3   Inc., versus Does One through Ten, et al.

4          Counsel, please step forward and state your

5   appearance for the record.

6     **MR. HENNESSY:**  Your Honor, Brian Hennessy, on behalf

7   of Tagged.

8          **THE COURT:**  Mr. Hennessy.

9          Anyone else here on this matter?

10          Mr. Hennessy, I scheduled a hearing initially because

11  I had some concerns about the scope of your request.

12     **MR. HENNESSY:**  Mm-hm.

13          **THE COURT:**  As I understand it, your client operates

14  some kind of a social networking site which it believes has

15  been compromised by people who are entering the site and, in

16  effect, posing themselves as other members of your site, and

17  then, one way or another, redirecting your, you know,

18  legitimate members, if I can use that term, to other sites,

19  which ultimately bring them into, apparently, some pornography

20  sites or things like that.

21     **MR. HENNESSY:**  That's right.

22          **THE COURT:**  Basically, is that, in a nutshell, the

23  problem?

24     **MR. HENNESSY:**  Essentially, yes, sir.

25          **THE COURT:**  And what you want to do is be able to

```
 1  identify the folks who own both Isecurebill.com, urlzen.com, I
 2  think, a number of these other sites.
 3          MR. HENNESSY:  Right.
 4          THE COURT:  Now, where I'm having some difficulty is
 5  this.  What you've basically asked for is what I call a "blank
 6  check."  You know.  Just give me an authority to issue
 7  subpoenas.
 8          What I -- your request is similar to requests that
 9  I've often gotten facing the recording industry, if they're
10  trying to go after people who have been downloading music, and
11  all they know is their Web site.  I mean, this comes up in a
12  number of instances; but usually what people do is they tell
13  me, "Here's a subpoena we want to serve," as opposed to just
14  giving us a blank check to serve a subpoena.
15          Now, attached to your papers are some letters you've
16  sent.  For example, the first one is Moniker Privacy Services.
17  Who do you think they are?  Is that like an Internet service
18  provider?
19          MR. HENNESSY:  This is a privacy registrant.
20          THE COURT:  Okay.
21          MR. HENNESSY:  Yeah.
22          THE COURT:  So how would they be able to help you?
23          MR. HENNESSY:  So what happens is these Web sites
24  don't often, you know, put their actual identifying
25  information.  And so what they'll do is they'll sign up with a
```

1   privacy registrant that will register.  So, like, if I register

2   a Web site, I can go to a privacy registrant, who then puts

3   their name and their information.  So if there are any requests

4   for the identifying information of the subscriber, the privacy

5   registrant comes in.

6            **THE COURT:**  Another hurdle.  That's one I hadn't seen

7   before.

8            **MR. HENNESSY:**  Yeah.

9            **THE COURT:**  But Google is one I'm familiar with,

10  because almost invariably, the kinds of requests for

11  information you're making either go to Google, they go to

12  Hotmail, they go to Yahoo!, et cetera.

13           So here's what I was propose.  How many subpoenas are

14  you proposing to issue?

15           **MR. HENNESSY:**  Well, it would be to -- there's --

16  let -- if you don't mind, let me just explain.  There are two

17  steps to it.  The first step is the owner of Isecurebill.com,

18  right?

19           **THE COURT:**  Mm-hm.

20           **MR. HENNESSY:**  Whoever owns Isecurebill.com -- that's

21  the pornographic Web site that essentially all link to

22  Isecurebill.com.  So in order to know who the affiliate

23  programs are -- the people who pay people for referring others

24  to Isecurebill.com -- we first have to know who Isecurebill.com

25  is.

1            THE COURT:  Right.

2            MR. HENNESSY:  So Exhibit A is the subpoena that we

3    want to serve on the owners or operators of Isecurebill.com.

4            THE COURT:  Okay.  Well, why don't I have a subpoena?

5    That's the problem.

6            MR. HENNESSY:  Sure.

7            THE COURT:  All I have is a list of what you want.

8    And, frankly, it's not the easiest thing to slog through.

9            MR. HENNESSY:  I apologize for that.  And so --

10           THE COURT:  And so the concern that I have --

11           MR. HENNESSY:  Mm-hm.

12           THE COURT:  -- is with the scope of it.

13           So all you want to find out from Isecurebill.com is

14    what?

15           MR. HENNESSY:  The information in Exhibit A,

16    essentially.

17           THE COURT:  That's what troubles me.  That can get

18    you into an awful lot of privacy situations.

19           For example, let's assume Isecurebill.com has 20

20    people working for it.

21           MR. HENNESSY:  Mm-hm.

22           THE COURT:  Everybody, from the people who own it

23    down to the receptionist at the office or, you know, the mail

24    room -- you're saying you want all logs, records, data,

25    documentation, or other information pertaining to names

```
 1  current, and former addresses, telephone numbers, e-mail
 2  address, I.T. addresses, for all the responsible, registering,
 3  maintaining, operating -- that's an awful lot of folks.  Don't
 4  you just really want to know who Isecurebill.com is?
 5          MR. HENNESSY:  Yes.  That's right.  And if you have
 6  concerns with it --
 7          THE COURT:  I do.  That's why you're here.
 8          MR. HENNESSY:  Okay.  So I mean yes.
 9          THE COURT:  Here's what I would like you to do.
10          MR. HENNESSY:  Sure.
11          THE COURT:  Here's why I called this matter.  I'd
12  like you to submit the subpoenas you actually want.
13          MR. HENNESSY:  Mm-hm.
14          THE COURT:  That's what I usually get.  And then I
15  can make a determination.  Okay?  From Google, you're entitled
16  to get this; from "Monkey Service," you're entitled to get
17  that.
18          The second thing I'm not clear about --
19          And I will authorize a certain amount of discovery,
20  subject to what I'm about to tell you.
21          MR. HENNESSY:  Sure.
22          THE COURT:  -- is usually I give the individuals
23  involved some opportunity to object.  And what I'm not clear
24  is, at the top of page 3 you say, "order that provider."  Who
25  would be a provider, under your definition?
```

1          **MR. HENNESSY:**  It would be the Internet service

2    providers and the privacy registrants.

3          **THE COURT:**  Okay.  So it is.  All right.  So Google

4    would be a provider?

5          **MR. HENNESSY:**  Sure.

6          **THE COURT:**  Okay.  So you order that the provider

7    shall identify the individuals.

8          So let's assume that Google knows, you know, three

9    people that I'm willing to -- as I say, I'm not willing to just

10   give you carte blanche to learn everything, including telephone

11   numbers -- and you want financial information, as I recall, and

12   so on -- about everybody, because you're not going to go after

13   the -- you know, the desk clerks; at least, not at this stage.

14   You're going to have to go another level to show me there's a

15   need for that information --

16         **MR. HENNESSY:**  Okay.

17         **THE COURT:**  -- before I give it to you.  Okay.

18         What I want Google to do is -- let's assume Google

19   says, okay.  One of the people, the owner of Isecurebill.com,

20   is Joe Smith.

21         **MR. HENNESSY:**  Right.

22         **THE COURT:**  Then I would like Google to notify

23   Joe Smith that they're getting this information.

24         **MR. HENNESSY:**  That's right.

25         **THE COURT:**  And that was not entirely clear to me.

1              **MR. HENNESSY:**  Provider shall identify the

2         individuals or entities upon whom the subpoena's

3         directed within five days of the subpoena, and in

4         that five-day period, serve such individuals or

5         entities with a copy of the subpoena and this Order.

6              **THE COURT:**  Okay.  Then number three says -- this is

7    where I get confused.  So those would be the people identified

8    by the prior --

9              **MR. HENNESSY:**  That is right.

10             **THE COURT:**  So that was not clear to me, whether you

11   were requiring Google to file the motion, because sometimes

12   Google will, depending on their operating agreement with Yahoo!

13   or whoever.  So I wanted to be clear that it is the individuals

14   who are identified.

15             **MR. HENNESSY:**  Yeah.

16             **THE COURT:**  And I think five days is probably not

17   enough turnaround time, but ten days I will accept.

18             **MR. HENNESSY:**  Okay.  So I can put ten.

19             **THE COURT:**  If you can give me specific subpoenas, so

20   I know that I'm approving a subpoena to Google, a subpoena to,

21   you know, whatever, which is narrower in scope than what you

22   now have --

23             **MR. HENNESSY:**  Mm-hm.

24             **THE COURT:**  So you're really focusing yourself on

25   what you need.  And, you know, there may come a time -- I mean,

1   obviously, it seems to me to get this thing going, you just

2   need find out who Isecurebill is.

3          You're not yet at the stage where you need to

4   necessarily find out what everybody's telephone numbers are or

5   everybody's e-mail addresses are or everybody's home address is

6   or everybody's billing information.

7          **MR. HENNESSY:**  Well, so here's the one issue, is

8   Isecurebill -- they're not necessarily the defendant.  So if I

9   come back to you and I give you a subpoena that identifies who

10  Isecurebill.com is under Exhibit A, once we know who

11  Isecurebill.com is, and assuming that person is an actual

12  person -- didn't put some fake address, right?

13         **THE COURT:**  Right.  Then come back, and I'll give you

14  more.

15         **MR. HENNESSY:**  You want me to come back in stages?

16         **THE COURT:**  At least until I get a sense for how this

17  is going to play itself out.  I'm reluctant when you're asking

18  for private information to, in effect, give you carte blanche,

19  so that you can just, you know, keep churning out subpoenas and

20  subpoenas.

21         **MR. HENNESSY:**  Mm-hm.

22         **THE COURT:**  And part of the reason is what I'm about

23  to tell you --

24         **MR. HENNESSY:**  Uh-huh.

25         **THE COURT:**  -- which is that yesterday an incident

1  occurred which has caused me to question this entire operation

2  which is all being done.

3          Your declaration -- are you satisfied, as an officer

4  of the Court, that these incidents occurred; that Tagged is

5  legitimate; that there's a legitimate purpose for their

6  securing this discovery?

7          **MR. HENNESSY:**  Yes, of course.

8          **THE COURT:**  Well, okay.  Yesterday I got an e-mail

9  which looked to be an e-mail from a friend of mine -- I'll give

10  it to you in a minute -- in which told me that she had sent me

11  some pictures.  And it was actually an e-mail I was sort of

12  expecting, because when you've been trading e-mails -- and I

13  will be seeing her in the foreseeable future -- about pictures.

14          I went.  So I clicked through.

15          **MR. HENNESSY:**  Yeah.

16          **THE COURT:**  I wound up on a Tagged site.  To view the

17  pictures, I had to register, which required me to enter an

18  awful lot of personal information.

19          **MR. HENNESSY:**  Mm-hm.

20          **THE COURT:**  And, consistent with the training I've

21  received from the Marshals, at some point, I stopped entering

22  the information.  It wouldn't accept it.  So then I went back

23  and I entered incorrect information.  I mean, I didn't give

24  them my date of birth.  I didn't give them my personal

25  cell-phone number.  It was amazing to me the information that

1  they asked for to simply view a photograph.

2         **MR. HENNESSY:**  Two.  I think there were supposed to

3  be two.

4         **THE COURT:**  Eventually, I got onto the site.  There

5  were even some cautions -- "Do not provide incorrect

6  information" -- but I got onto the site.  There were no

7  pictures.  I started rummaging around, trying to find the

8  pictures.  The site crashed my computer.

9         I sent an e-mail.  I sent two e-mails:  one to my

10 wife, to find out whether she had any luck in getting the

11 pictures; and she hadn't.  And I sent an e-mail back to my

12 friend, saying, "I can't open these pictures."

13        She sent me back an e-mail saying, "The e-mail you

14 got didn't come from me."  Tagged -- apparently, she had the

15 same thing done to her.  She'd gotten an e-mail from a friend

16 saying, "Look at some pictures."  She'd gone on.  Unlike -- I

17 guess she hadn't had the same training from the Marshal.  She

18 provided all of her information.

19        Tagged, apparently, took over her address book, and

20 then sent e-mails to everyone in her address book, doing the

21 same thing.

22        So she apologized.  She said, "You know, I -- I

23 didn't post any pictures.  Your e-mails may now have been

24 compromised."

25        And I said, "All right.  Well, that's interesting,

1  because Tagged is going to be in court tomorrow.  I'm going to

2  ask them about this."

3          Here's the e-mail I got.  If you look at it

4  carefully, I can now see that the e-mail comes from

5  taggedmail.com, even though it looks to be like an e-mail

6  coming from my friend.

7          And what I'm going to ask you to do is, as an officer

8  of the Court, to look into this, because what I found out -- my

9  wife then got interested.  You may or may not know this, but

10 there is an awful lot of negative information about your client

11 on line.  Everybody's having these experiences.  I'll read you

12 one.  Quote, "Tagged.com is notorious for spamming the entire

13 address book of its users."

14         That's, apparently, what this is called.

15         So you simply get onto somebody's -- send somebody an

16 e-mail, and they have, apparently, a way of then extracting

17 your address book when you open up, you know, this Tagged

18 thing, which can lead to unwanted e-mails sent to friends and

19 family.

20         Tagged.com frequently sends out e-mails saying,

21 "Someone has read your profile," in order to drive traffic back

22 to the site, which creates all kinds of problems.  There are a

23 number of -- I have read a number of experiences of people very

24 recently, April 8th, 2009 -- of someone people who have had the

25 exact same experience that I have had and my friends have had,

```
1   where they get these e-mails that appear to be from somebody

2   they know.  It turns out they're directing them to a Tagged

3   site to look for pictures.  There are no pictures.  You know,

4   the person didn't authorize the e-mail.  The person didn't post

5   the pictures.

6           And, from what I can gain online, Tagged does this so

7   it can -- what's the term for it? -- "mine" e-mail addresses.

8   You know, their e-mail addresses accumulate, apparently.  And

9   then what they do is they collect all this e-mail information,

10  and then they, apparently, sell it to spammers.  So -- or act

11  as spammers themselves.

12          So the question I'm putting to you is -- I don't know

13  how long you've represented Tagged, but this entire application

14  is based on your declaration that these things happened, and

15  that Tagged has a legitimate reason for wanting this

16  information.

17          MR. HENNESSY:  Mm-hm.

18          THE COURT:  My experience yesterday --

19          And, as I say, this was the reason I asked you to

20  show up, is to express these other concerns.

21          -- has how caused me to wonder whether this is a

22  legitimate operation; whether all Tagged wants is just a bunch

23  more e-mail addresses, and so on.

24          So what I'm going to ask you to do is, when you

25  submit your revised subpoenas, to report back to the Court.
```

1    And again, I'm deeming you an officer of the Court.  See if you

2    can figure out what's going on here.

3              **MR. HENNESSY:**  Yeah.

4              **THE COURT:**  And just -- you may want to think about

5    having Tagged, rather than having your -- I don't want to call

6    it "your neck on the line," but usually when I get these

7    applications -- and I say I typically get them from the

8    recording industry, the moving picture industry, lots of other

9    situations.  And then sometimes they're just in competitive

10   situations.  You know, somebody posts, say, an anticompetitive

11   e-mail, and somebody wants to find out who it is.  Usually, the

12   declarations come from the party.

13             So I haven't -- you know, I was willing to accept

14   it -- willing to accept it at face value until this incident

15   yesterday, and everything I've learned online about Tagged.

16   And I don't know whether it's true or not.  All I'm simply

17   saying to you is:  here's an unexplained situation.

18             I have some concern now, before I turn it over to the

19   Marshal, to find out whether, indeed, my e-mail has been

20   compromised; compromised because they knew my e-mail address.

21   And what I don't want to have happen -- and I don't think you

22   want to have happen -- is, for example, all of the other Judges

23   in this building start getting e-mails from Tagged saying, you

24   know, "Zimmerman sent you pictures.  View them."

25             At some point, Tagged is really going to regret this

1  if this happens.

2          **MR. HENNESSY:**  Let me respond to a couple things.

3  Okay.  First of all, I didn't know anything about this.  And

4  you have mentioned --

5          **THE COURT:**  I wouldn't have expected you to.  This

6  happened yesterday, you know, kind of early afternoon.

7          **MR. HENNESSY:**  Anything about any of this.  So I

8  didn't know.  So I have --

9          As an officer of the Court, when I put my name on

10  something, I believe it to be true.  And I can declare to it to

11  be true.  If you want to research me personally, you go ahead

12  and do that.  When I put my name on something, there's

13  integrity behind it.  I don't want you to think any kind of

14  e-mail harvesting -- I would sign my name to anything like

15  that.

16          **THE COURT:**  I can't.  I'm not questioning your

17  integrity.

18          What I don't know is how you got the information you

19  got; in other words, whether your client is supplying you with

20  genuine information, or have you personally gone online and

21  seen how these sites are being redirected?  Do you have

22  personal knowledge of --

23          **MR. HENNESSY:**  Yes.  The e-mail that's in the

24  declaration -- we were forwarded the text of the e-mail.  And

25  from the text of the e-mail, you can -- I got to see --

1          **THE COURT:**  No.  I understand all of that.  How do

2    you know that these e-mails are genuine?

3          **MR. HENNESSY:**  How do I know that the e-mails are

4    genuine that my client is forwarding to me?

5          **THE COURT:**  You're relying on their word?

6

7          **MR. HENNESSY:**  Yes.

8          **THE COURT:**  I'm not questioning your personal

9    integrity --

10          **MR. HENNESSY:**  Okay.

11          **THE COURT:**  -- but I'm simply saying to you I'm

12    beginning to wonder what Tagged is up to.  My experience is not

13    alone.  If you -- you know, if you Google "Tagged," you know,

14    "e-mail address book harvesting," or anything like that, you'll

15    be deluged with public complaints out there on a variety of

16    sites about this practice.

17          And, as you can see, you've got an e-mail in front of

18    you which is not genuine.

19          So it may be that somebody's doing this to Tagged.

20    Maybe that's another possibility.  Somebody is rerouting

21    things, you know, making it look like it's Tagged.  I have an

22    open mind.

23          **MR. HENNESSY:**  My understanding is that Tagged is a

24    very legitimate business, and it has over 70 million registered

25    users.  I have not heard of this or anything like this before

1  that Tagged has done, and don't have any knowledge of that.

2        And so what I'm going to do is, as soon as I leave

3  here, I'm going to go and talk to my client about this.  And

4  we'll get to the bottom of it.  How -- would you like us to

5  come back to you and show you, or how would you like the

6  information presented to you?

7        **THE COURT:**  If it can be -- unless you get in the

8  private information, I would just file it; but if you're going

9  to give them private information or information you don't want

10 to disclose, then just call my chambers, and we can set up a,

11 you know, telephone call or a meeting or something.

12       **MR. HENNESSY:**  About this e-mail in particular?

13       **THE COURT:**  That's right.  I would say in terms of

14 the general thing, all I'm asking is that -- I guess you can

15 simply file either another piece of paper, or probably best

16 practice is file something that somebody who has personal

17 knowledge --

18       **MR. HENNESSY:**  Mm-hm.

19       **THE COURT:**  -- from Tagged, simply confirming that

20 this is a genuine, you know, incident; that -- you know, that

21 somebody -- to the extent somebody can have personal knowledge,

22 these are true and correct copies of e-mails, you know, that

23 appear on Tagged customers' sites or, you know, whatever the

24 appropriate thing is.

25       **MR. HENNESSY:**  For the e-mails that --

1       **THE COURT:**  -- that are the subject of your request

2 administrative request for discovery.

3       **MR. HENNESSY:**  Sure.

4       **THE COURT:**  Okay.  I'm just saying that what -- I

5 just want the record to be clear at this point that I do have a

6 genuine controversy in front of me.  This is just not a request

7 by Tagged to get a lot more information -- e-mail address

8 information that it is tagging that it will mine.

9       So all I really need is -- it can be from you, if you

10 can do it, or somebody can say, You know, typically, many of

11 these sites have -- I'll call them "enforcement officers."

12 that's usually where I get the declaration from, you know.

13 "We've heard about this problem.  I went online.  I found this.

14 I found that.  I couldn't do this and that.  And, you know,

15 here's the issue."

16       **MR. HENNESSY:**  Okay.

17       **THE COURT:**  Some of them have them in-house.  There

18 are out-house services.  I don't know what Tagged does.  That

19 would probably be fine.  If you can submit that declaration,

20 that would be fine.

21       In terms of the other issues, as to whether my

22 mailbox has been compromised -- and, as I say, I think it's

23 kind of bizarre -- but as I say, the end result is going to be

24 if it has been, that, you know, Tagged better be getting a

25 visit from the Marshal or from the Chief Judge.  I don't think

1   anybody wants that to happen, which is why I'd like to deal

2   with it informally at this stage.

3          **MR. HENNESSY:**  Okay.  So as to your e-mail, do you

4   want anything from Tagged?  Do you want us to come in and get

5   to the bottom of this and talk to --

6          **THE COURT:**  Yeah.  I would like you to report back,

7   to find out -- what I'd like to know is what the explanation

8   for that is, and whether Tagged now has the contents of my

9   e-mail address book, because I did go online.  They knew my

10  e-mail address.  Okay?  They knew a certain amount of

11  information in front of them.

12         Now, I filled out some of the information truthfully,

13  but at some point when they started asking me for a lot of

14  personal information, I started, you know, giving them

15  information which was not entirely correct, you know.  I would

16  jumble numbers, or things like that.

17         So I don't know where ultimately that's going to get

18  us, but I do know that Tagged now knows who I am.  They have

19  certain amount of information about me that was correct, before

20  I became suspicious.  They know my e-mail address.

21         And my concern is that, if I understand what happened

22  to my friend, merely by somehow getting me to open up the

23  pictures, that that -- I don't know whether it's a virus or

24  what they're doing, but that allows them to extract the

25  contents of my e-mail address book.

1    **MR. HENNESSY:**  How would you like me to -- how would

2    you like me to present, once I get to the bottom of it?

3        **THE COURT:**  This was what I was trying to explain

4    earlier.  If you can do so without disclosing a lot of personal

5    information, you can simply file something; but if that's going

6    to be a problem, then what you can simply do is call chambers.

7        **MR. HENNESSY:**  Got it.

8        **THE COURT:**  You can come in and talk to me.  We can

9    talk by phone.  I'll give you leave to file something under

10   seal.  Since I don't know right now what the explanation is

11   going to be, I can't give you any more guidance.

12       **MR. HENNESSY:**  I'd like to come and talk to you in

13   person.

14       **THE COURT:**  That's fine.  That's fine, but -- okay.

15   For the short term follow-up, one piece of paper, just to

16   assure me that the underlying dispute is genuine.

17       I'm not questioning your integrity.  There is a break

18   in what we would call the "chain of evidence."

19       File the specific subpoenas you would like issued to

20   Google and to a privacy service and so on, with a couple of

21   amendments that we talked about.  I will go ahead and authorize

22   the discovery.  And if it turns out later on that you need

23   another wave of discovery, you know, I'll sort of authorize

24   that; but I guess I'm treating you no different than I treat

25   some of the law-enforcement officials who come in and say,

1  "Here's what we want find out."

2          I say, "I'll give you what you need right now."

3          If it turns out you need more, we'll come back.

4  Okay?  All right.

5          **MR. HENNESSY:**  We'll be in touch.  Thank you.

6          **THE COURT:**  Good day.

7          (At 10:28 a.m. the proceedings were adjourned.)

8                          -   -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Lydia Zinn, CSR, RPR*
*Official Reporter - U.S. District Court*
*(415) 531-6587*

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C. 09-1706-BZ, Tagged, Inc. v. Does 1-10 et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Wednesday, June 3, 2009